Nettie M. Hatfield, Administratrix, Appellant, v. White Line Motor Freight Company, Inc., Appellee.

No. 43714.

March 9, 1937.

Miller, Miller & Miller, for appellant.

Carr, Cox, Evans & Riley, for appellee.

Parsons, J.—In 1935 the W. B. Ewer Construction Company erected an office building for the Maytag Company in the city of Newton, Iowa. This building stood on the north side of an east and west street. It is faced with stone. The building was erected and the roof put on by September, 1935. There were three foremen on the job, all employees of the construction company. Paul H. Hatfield was foreman of the stone and brick work. The street upon which the building faced was 54 feet wide, from the office building on the north side of the street to the Maytag factory on the south side of the street. The condi-

tion of the street, as it existed on April 9, 1936, is shown by various photographs, Exhibits A, B, and C. In the process of erecting the building and placing the stone on the front thereof, which was the south side of the building, a derrick was mounted on the roof of the new building, with three ropes running from the top of the pole in different directions, to hold it in place and to steady it while stone was being lifted into place. Along the street, on the north side of the factory building, ran a railway switch track for car loadings, and at the end of the track was a bumper to which one of these guy ropes was sometimes fastened. This railroad ran along the factory building and was enclosed by a woven wire fence, which also enclosed the bumper. This track and fence took up a part of the street between the office building and the factory, so that the width of that portion of the street left open to the public was about 33 feet, from the north side of the fence to the office building.

The derrick mounted on the roof of the office building consisted of a pole mounted on a framework, with three ropes from the top of the pole, running in different directions to hold and steady the pole. Two of these ropes were fastened in the back of the building, and the third rope was stretched across the street and fastened to the fence, or to the bumper at times, and sometimes it did not stretch across the street, but was fastened down in front of the building near the mixer. The derrick was movable back and forth, and was approximately twelve feet high, the pole being a 6x6. Besides the poles and ropes there was a winch with a cable with which the stone was hoisted. The framework of the derrick is composed of a piece of timber four feet long and six inches wide with rollers on it, and on top of this is placed the pole, straight up. On top of the pole was a ring for the ropes to be tied to, two guy ropes being fastened back on the building, and one in front. The winch is a crank with two handles, one on each side, operated by two men generally. The rope that was sometimes stretched across the street is called a tag line, and its use was to keep the derrick from falling backward; the other two ropes to keep it from falling forward. When drawing up stone the pole will give at least a little, and that would cause the tag line to slacken or sag.

On the afternoon of September 3, 1935, in the construction of the office building, it became necessary, or advisable, to raise from the street quite a large stone to be put in place in the front

wall. Hatfield had charge of this part of the work, directing just how it should be done, and under his direction the tag line was fastened to the bumper at the end of the switch track, thus crossing the street diagonally from the north side to the south side. Assisting Hatfield was a man by the name of Harthorn, and one Boley. Boley was winding up the winch, to raise the stone, Hatfield and Harthorn were holding down the other two ropes, which were anchored to steel beams which came up above the roof, each rope tied in a hook in the end of the beam, and tied so as the knot would not slip. The ropes ordinarily would be tightened up good so the derrick would be straight; it was customary to so fasten them tightly. But this day Hatfield and Harthorn were holding down the ropes. Harthorn said in his testimony, "I had never known of it being done by a man sitting down on the rope, and holding it down as it was done that day", and added that Hatfield said, "This is our last stone and we will hold it down instead of tightening it up." Near Hatfield was an elevator shaft, west and a little north of where he was working. He was near the elevator shaft so he could call to the men on the lower floor to tell them what to do in setting the stone. Boley was drawing up the stone.

The photographs, Exhibits A, B and C did not show the condition of the street as it existed September 3, 1935. Exhibit 1 is a photograph showing the condition of the street on September 3, 1935.

The street was open to travel, at least trucks were passing through there quite frequently to the factory building on the south side of the street, probably loading and unloading. On September 3, 1935, a truck of the defendant, of the trailer type, came along the street and struck the guy rope stretched across the street, and the ropes which Hatfield and Harthorn were holding down on top of the building were suddenly jerked from under the men, throwing Harthorn about six feet away, and throwing Hatfield into the elevator shaft, where he fell to his death.

The plaintiff in this case is the widow of Hatfield and the administratrix of his estate, and she brings this suit to recover damages occasioned by his death. In her petition she sets up that the plaintiff, Nettie M. Hatfield, was the administratrix of the estate of Paul H. Hatfield, deceased, and alleged the employment of Hatfield by the W. B. Ewer Construction Company in building the two-story office building for the Maytag factory

at Newton, Iowa, and that the deceased was a foreman of the construction company, working on the roof of said building, assisting in placing the stone, which at that time was being lowered by the derrick mounted on the roof of the building, and that one of the ropes by which the derrick was held in place, extended from the top of the derrick, some ten feet above the building, in a southeasterly direction across the pavement, to the south side thereof, where the same had been made fast several feet above the ground. That Ferd Brunk, a driver for the defendant, operating a truck for it, in a careless and negligent manner, ran into the rope causing the derrick to be disturbed in such way that it hurled her husband to the ground and killed him. The petition alleged six grounds of negligence, as follows:

1. That said defendant was negligent in failing to keep a lookout for said tie rope.

2. That said defendant was negligent in attempting to drive said truck under said tie rope, and too close to the lower end thereof to permit clearing the same.

3. That said defendant was negligent in failing to avoid contact between said truck and said tie rope.

4. That said defendant was negligent in driving said truck into and against said tie rope.

5. That said defendant was negligent in failing to stop said truck immediately upon the same coming in contact with or striking said tie rope.

6. That said defendant was negligent in continuing to drive said truck ahead after striking said tie rope and until said derrick had been pulled down and plaintiff's intestate had been thrown from the top of said two-story building and hurled to the ground.

To this petition an amendment to conform to the proof was filed by plaintiff, alleging a seventh ground, to wit:

"That the defendant was negligent in failing to stop said truck within the assured clear distance ahead."

The answer of the defendant admits that plaintiff's decedent was on September 3, 1935, killed by a fall from the roof of the building; denying each and every other allegation of plaintiff's petition; specifically denied it was guilty of any negligence which was the proximate cause of the death of decedent.

Such were the facts, and the pleadings of the case. At the

close of plaintiff's evidence the defendant made a motion for a directed verdict, setting forth:

1. The failure to show that the defendant was guilty of negligence as alleged.

2. That the defendant had a right, in the absence of actual knowledge, to assume freedom from aerial obstruction.

3. That there was no evidence that the driver had any knowledge of the rope which caught on the top of the truck was across the street in a position not to clear the trailer, and the right to assume there was no rope there with which his truck would come in contact.

4. That the driver had the right to assume that the rope was in a position to clear the truck, and hence the collision with the rope did not constitute negligence.

5. That in placing the rope across the street as it was placed, under the supervision of plaintiff's intestate as foreman, constituted a nuisance under sections 12395 and 12396 of the code, and rendered the plaintiff's intestate guilty of contributory negligence as a matter of law.

6. That defendant's driver was not guilty of any negligence.

7. That there was a failure to prove plaintiff's intestate was free from negligence.

8. The evidence affirmatively shows that plaintiff's intestate was guilty of contributory negligence as a matter of law.

9. That the plaintiff's intestate was one of the foremen of the construction company, and the rope in question was placed where it was under his supervision, and by reason thereof he was guilty of contributory negligence.

10. That upon the whole record in this case, plaintiff is not entitled to recover.

11. That if a verdict were returned in favor of the plaintiff the court would be compelled to set the same aside as a matter of law.

This motion was sustained by the court, and a verdict in favor of the defendant. Judgment was duly entered on the verdict, and appeal is taken to this court by reason thereof.

It is evident that any strain put on the tag line as it crossed the street, would tend to pull the derrick forward, and thus render more taut the two steadying ropes, which were attached to the top of the pole, and might very well throw anyone down who attempted to hold down the ropes. So in this case, Hatfield

being so close to the elevator shaft was pushed into it and met his death.

We are met with the following propositions:

1. Was the defendant in this case guilty of negligence such as resulted in the death of Hatfield?

2. Was the deceased, under the circumstances, guilty of any such negligence as contributed in any degree whatever to his injury or death?

3. This case involves what were the rights of the defendant truck company on the street.

4. By what right was the street obstructed by stretching the guy rope across it?

The answer to these questions will determine, of course, this case.

In considering the question as to whether or not the defendant can be held on the ground of negligence, it is necessary, of course, to take into account all of the surrounding facts as to the condition of the street, as to the derrick and the wire across the street at the time. And it is also necessary to take into account the traffic on the street at the time, the character of the vehicle or automobile which it is claimed that the defendant's employee was using negligently at the time of the accident.

The derrick in this case was held in place by three guy ropes, one running across the street where it was fastened, and the two fastened back on the top of the building. These ropes coming together would form a sort of triangle that braced and held the upright on the derrick in position, which, of course, was sitting back on the roof of the building. When the derrick was put in use it was used to take up a stone on the street and bring it up where it could be used in the construction of the stone work on the face of the building. That was what was being done at the time of the accident.

It is evident, viewed in this way, that the weight of the stone, which was quite heavy, would naturally pull the upright of the derrick over toward the street, and hence, would cause a slack in the tag line, lowering it so a vehicle going up the street might pass under this rope, if the derrick were not in operation, but if it were in operation, the danger from collision with the rope, or tag line, would be greater by reason of it being lowered. So it is evident that the more solidly the two other guy ropes

were fastened, and the tighter they were, the less would be the slack in the tag line across the street.

The evidence shows that the customary way, prior to lifting this stone, was to tighten up, make more secure, the two ropes from the derrick and fastened to the top of the building, and that was the usual method of doing it. The plaintiff's decedent, however, in charge of the work, made the remark that it was the last stone for the day and they would try to hold down the ropes by sitting on them and holding them, instead of fastening them. So it is also evident that anything that touched the tag line and added to the weight of pulling the derrick toward the street, would make the strain on the ropes attached to the top of the building that much greater, and hence that much more difficult to hold down. So when there was a collision of the truck with the tag rope, the strain on the other ropes became so great as to throw off the men holding them, and as plaintiff's decedent was near the open elevator shaft, there was more liability of his being thrown into the shaft, and this is the way the accident happened.

A glance at Exhibit 1 in appellee's denial of the abstract shows the condition of the street at the time of the accident. One looking at this picture would have great trouble imagining how an automobile could get through at all. The street is all cluttered up. But the record shows that during the day different trucks came in there, this truck came in there. There had been no collision with this tag line before, but it is claimed this truck in going out struck the tag line. It must have been the top of the truck. There is no showing whatever of the height of the truck, nothing except that it was of the trailer type.

It must also be evident, when one stops to think, that the driver of the vehicle in the highway, constructed as trucks and automobiles are constructed, is not chargeable in the same degree with discovering aerial objects as in discovering objects in the street. That whatever may have been the rights of the contractor erecting the building, or even the owner of the building, to obstruct, litter up, the street in front of his premises, this right did not to the same extent obtain as to aerial objects.

The record also is entirely void of any testimony, or any showing as to anything that was done to call the attention of the driver on the street to be constantly looking up instead of looking where he was going on the street, to discover dangerous in-

strumentalities up in the air, which would be out of his line of vision as he picked his way through the street, crowded as this street was with so many obstacles to easy travel.

■■■ With these considerations in mind, therefore, we are of the opinion, taking all of the circumstances that existed at the time of the accident into account, that there is no showing here whatever of any negligence on the part of the driver of the truck, and upon this ground alone the motion to direct a verdict should have been sustained.

We think that the following authorities support the views we have here expressed:

Weaver v. Dawson County Mut. Tel. Co., 82 Neb. 696, 118 N. W. 650, 651. 22 L. R. A. (N. S.) 1189, is a case in which plaintiff sued a telephone company for injuries suffered from coming in contact with wires across a road. He had been hauling hay over the road in question. The hayrack had a pole bolted on it, which reached ten feet from the ground. This piece struck the telephone wire and broke the upright, and the plaintiff was severely injured. The court says:

"The defendant contends that it was the duty of the plaintiff, when approaching the place where the telephone line crossed the road, to have looked and examined the wires before attempting to drive under, and that his failure to do so constituted contributory negligence."

There was a verdict and judgment for plaintiff, and on appeal the supreme court held against this contention, saying:

"Driving along a road under a telephone or telegraph wire, properly constructed, is not attended by any danger. It is unlike crossing a railroad where a train is liable to pass at any time, and the rule which would require a person about to cross a railroad, to stop and look before so doing, has no application to a person driving along either a public or private road which is crossed by telephone or telegraph wires.

"The plaintiff did not observe that the wire was down, or that it was likely to strike his hayrack. Within a few days previous to this accident he had hauled a number of loads of hay over the same road, and he had experienced no interference or trouble with the defendant's wires. He was under no obligation to anticipate any danger or to stop and look and examine de-

fendant's wires. The evidence was wholly insufficient to justify a finding of contributory negligence, much less requiring such a finding.''

Jacks v. Reeves, 78 Ark. 426, 95 S. W. 781, holds that an instruction, in an action for injuries received by a traveler on a highway in coming in contact with a telephone wire dragging over the highway, due to a broken pole, that plaintiff, in order to recover, must prove that the accident occurred through the negligence of the owner of the telephone line, was misleading, because not qualified by a charge that the evidence of the accident and injury following therefrom, when the occurrence was not out of the usual course, was prima facie evidence of the negligence, and shifted the burden to defendant to prove that the injury was not caused by any want of care on his part.

Further, the court held that a traveler driving along the highway is not required to look up to see if a telephone wire is in reach of the top of his vehicle in order to be free from contributory negligence precluding a recovery for injuries received in consequence of the vehicle coming in contact with a wire dragging over the highway in consequence of a broken pole.

If in such a case the traveler is not required to look up, to see if the wire is in reach of the top of his vehicle, in order to be free from contributory negligence, it certainly could not be held that there was any duty on him to be looking up.

In McWhorter v. Draughn et al., 134 Miss. 247, 98 So. 597, it was held that a traveler upon a highway is only charged with the duty of using reasonable care to prevent running into other vehicles which are using the road in a reasonable and customary manner, and hence was not bound to discover a chain stretched across the road.

In Wheeler v. City of Fort Dodge, 131 Iowa 566, 108 N. W. 1057, 1058, 9 L. R. A. (N. S.) 146, in an opinion by Judge Weaver, in a case where there was an obstruction of a wire in the street running from the court house across the street, it was argued that this was not in a sense a nuisance. The court said on page 570:

''The fact that the wire in most of its course passed through the air above the heads of the people using the walks and carriageway below does not remove its character as an obstruction of the street. The public right goes to the full width of the

street and extends indefinitely upward and downward so far at least as to prohibit encroachment upon said limits by any person by any means by which the enjoyment of said public right is or may be in any manner hindered or obstructed or made inconvenient or dangerous.''

It is also said in 29 C. J. 697, sec. 461:

''A traveler has a right to rely upon the presumption that the highway is in a reasonably safe condition for travel and free from obstructions and he need not keep his eyes constantly fixed on the road or path, or look far ahead for defects which should not exist.''

To this statement of the rule we might say that a traveler on a highway that is already cluttered up so he has to pick his way through it, having enough to do to avoid the obstructions which are in plain view, cannot be held to keep one eye on the ground and the other eye open for aerial obstructions, especially when he knows he is on a highway that is constantly used for the purposes the highway in question was used.

The record shows that quite a number of trucks used this street; that it was the road they used for the trucks to go into the loading yard where they loaded freight, and that material for the building came in by truck on that street. That other White Line trucks came in there at various times. It also shows that after the accident this rope was still fastened to the derrick, and also to the bumper; but the derrick was hanging over the top of the building, at least about twelve feet. A witness describing this said that after the accident the truck was standing on the south side, headed east, and as to whether there was anything unusual about the truck, he said there was the rope still hanging over the truck body, just behind the cab, and it was still fastened to the derrick and the bumper at that time. So if the truck moved very little after it hit the guy rope, if it did hit it, stopping within that short distance, it was going slowly, as the rope was not broken. The stone fell just east of the small door of the building, shown in the photograph Exhibit D, which shows the front of the building under construction, more than seven months after the accident, when the street had been completely cleared of all debris existing at the time of the accident.

The following is laid down as the law, in 5 Blashfield's

Cyclopedia of Automobile Law & Practice (Permanent Ed.), page 457, sec. 3320:

"An automobile driver is not required to anticipate unusual obstructions on the public highway, but he is not privileged to assume that it was not negligently obstructed in the face of formidable physical obstructions which are plainly visible. He cannot ignore highway conditions commonly prevalent and with which he is familiar, nor can he assume that a roadway in process of construction or repair would be clear at night, merely because it was clear in the morning when he drove over it. He is not bound, however, to discover such obstructions as a chain stretched across the road."

The succeeding section lays down the proposition that, when a traveler knows that a highway is dangerous or when he knows of a condition that constitutes a warning of unusual peril, he is bound to exercise ordinary care to avoid any danger which he has reason to apprehend.

In driving over this street near the Maytag plant, at the time of the accident, the driver of the truck would be held to avoid any dangers which are open to his observation in going on the street, such as an obstruction on the surface of the street. He could not be held to be observing both the street and the air at the same time.

The rope in this case which was struck was not torn down or broken. The driver was not bound to anticipate that just at the time he came along there this rope would sag and catch on his truck, or that because of this the other two ropes, which had not been fastened securely, would cause a possible sagging. In other words, he was not bound to know that they were not tied to something so solid that they would resist the tendencies of the pole to bend over and thus lower the tag line and catch on the truck.

In Wegner v. Kelley, 182 Iowa 259, 267, 165 N. W. 449, 452, the court held with reference to a telephone wire, that only at places of ingress and egress along public highways need telephone wires be placed and kept at such a height as to afford the property owner unobstructed access to his lands for all ordinary use. At places not of ingress or egress to adjoining lands, the owner of the line may place and keep his wire where he pleases, provided: (1) he does not incommode the public in the use of

the highway; (2) he exercises reasonable care at all times, in view of the many and varied circumstances which may be manifest or reasonably apparent to him while installing and maintaining his lines. In this opinion Judge Ladd said:

"The wire must be high enough for the usual and ordinary travel on the highway—not for any and all travel * * *; and this the traveler may assume without keeping a lookout for wire obstructions over the traveled way. * * * If the line is seen, of course, ordinary care must be observed to avoid injury therefrom. * * *

"In other words, in traveling the road, or entryway, he may assume, in the absence of knowledge to the contrary, that the wire is beyond the reach of all ordinary vehicles of travel; for otherwise the line would not have been so constructed as not to incommode the public; and this is to be taken into consideration in determining whether he has been without fault."

This is discussed on the question of the negligence of the plaintiff in a case. The rule laid down is clear. A person claiming damages by reason of an accident is held to show that he is not guilty of contributory negligence. In an ordinary case where the defendant is sued, as in this case, the burden is upon the plaintiff to show that the defendant actually was negligent. So if an aerial obstruction, such as is present in this case, existed, the burden of proof is upon the plaintiff who brings a suit to show by a preponderance of the evidence that the party charged with negligence in an instance such as this, negligently committed an act which resulted in the injury.

Following the rule laid down in the opinion of the Wegner case, that the person on the highway may assume, in the absence of knowledge to the contrary, that the wire or obstruction is beyond the reach of ordinary vehicles, the truck of defendant in this case was an ordinary vehicle. Trucks were constantly going in and passing out while delivering or removing material for the great manufacturing establishment which stood opposite the office building. So the street was ordinarily used for that purpose, and the drivers of the various trucks going to and from were not charged with the notice that a rope stretched across the street was of such height that it would catch on trucks passing. Hence, if the doctrine of this case is to be followed there was no negligence shown here on the part of the truck driver, and hence,

upon that ground alone the motion should have been sustained.

The general rule was laid down in Kendall v. City of Des Moines, 183 Iowa 866, 167 N. W. 684. This case, of course, applied to surface obstructions. But the rule laid down is that the operator of an automobile is not necessarily guilty of negligence *per se* for failing to have the automobile under such control that he can stop it within a distance he can plainly see obstructions ahead of him.

This was held in a case where the operator of a car, on a misty night, drove into an open excavation on a public road. Had it been in the daytime, when there was no obscurity of the danger to be apprehended, which was on the surface, the driver would be bound to take notice of it.

The appellant in its brief and argument cites the following Iowa cases as authority in opposition to the position of appellee, to wit: Abraham v. Sioux City, 218 Iowa 1068, 250 N. W. 461; Ege v. Born, 212 Iowa 1138, 236 N. W. 75; Holderman, Admx., v. Witmer, 166 Iowa 406, 147 N. W. 926; Winter v. Davis, 217 Iowa 424, at page 436, 251 N. W. 770; Swan v. Dailey-Luce Auto Co. et al., 221 Iowa 842, 265 N. W. 143; Lukin v. Marvel, 219 Iowa 773, 259 N. W. 782; Sec. 5029, Code of Iowa; Kisling v. Thierman, 214 Iowa 911, 243 N. W. 552; Wosoba v. Kenyon, 215 Iowa 226, 243 N. W. 569; Lorimer v. Hutchinson Ice Cream Co., 216 Iowa 384, 249 N. W. 220; Kadlec v. Johnson Const. Co., 217 Iowa 299, 252 N. W. 103; Ellis v. Bruce, 217 Iowa 258, 252 N. W. 101; Townsend v. Armstrong, 220 Iowa 396, 260 N. W. 17.

As to each of the foregoing cases cited by the appellee, we have examined the same carefully and find nothing in any of these cases which in any way touches the particular facts in this case. The length of this opinion is such that it does not justify the burdening of it with an analysis of these cases showing their nonapplicability to the questions involved here.

2. Was the plaintiff's intestate, under the circumstances, guilty of any such negligence as contributed in any degree whatever to his injury and death?

■■■ The deceased was a foreman of the company, having charge of the stone work and the means by which it was placed in position. So he had full control over the derrick, over the placing of the guy ropes, the tag line. It is evident that the tighter the ropes were fastened to the building, the greater would be the resistance of the upright part of the derrick to bend

while the stone was being lifted, consequently causing a slack in the tag line. Ordinarily the two ropes on the back should be secured quite tightly, because it would prevent sagging in the tag line.

By the express directions of the foreman himself, the ordinary manner in which the work was usually done was not observed at the time of the accident. He didn't tighten the two guy ropes on top of the building, but concluded they would hold them down as it was the last stone to be put in (perhaps) that day. He was the employee of the construction company and entrusted by the construction company with the duties of looking after this matter; he knew that the street was open for traffic, at least to the extent of permitting trucks to go in and unload at the great plant across the street. There were a number of trucks constantly going and coming. Knowing this, Hatfield must have known that anything that would permit the tag line to slacken so as to be disturbed by these trucks, was dangerous. Yet he did it.

In Lane, Admr. v. Cent. Iowa Ry. Co., 69 Iowa 443, 446, 29 N. W. 419, 421, it was held that where the conductor in charge of a railway train knew every circumstance which tended to render the operation of his train hazardous, and if, in his judgment, it was not being operated in the safest possible manner, he had full authority to direct that such changes be made in the manner of its operation as would render it safe. It was held that:

"The conductor is the superior agent on the train, the other employees being subject to his direction and control. The engineer is bound to obey his directions as to the speed at which the train shall be run, unless he has express directions on the subject from the train dispatcher, who is the superior of the conductor. On the occasion in question the engineer had not been directed, as to the speed at which he should run, either by the train dispatcher or conductor."

Further on the court said: "Every circumstance which tended to render the operation of the train hazardous was known to the deceased [that is, the conductor]. If the transfer of the engine from the rear to the front end of the train was practicable, and would have lessened the danger attending its operation, he knew those facts, and had authority to direct that the change be made. If the rate of speed at which the train was being run

was hazardous, considering the liability to collision with cattle and the condition of the track, he knew that fact also, and had the authority to direct that it be run at a lower rate of speed. His position made him the judge of whether the train was being operated in the safest manner practicable; and if, in his judgment, it was not being so operated, he was empowered to direct that such changes be made in the manner of its operation as would render it safe. By permitting it to be operated in the manner in which it was being operated at the time of the accident, he, in effect, determined that that was the proper mode of operating it, and he was in precisely the same position he would have occupied had he expressly directed that it be operated in that particular manner. The case is clearly within the principle laid down in Dewey v. Chicago & N. W. Ry. Co., 31 Iowa 373.''

In the Dewey case it was held that as the deceased was the conductor and superior officer of the train, and directed the line of conduct which resulted in his death, it would estop his administrator from recovering against the company on the ground of negligence on the part of its employees.

We believe these rules to be sound, and that the court would have been right in sustaining the motion, even alone, on the ground of contributory negligence of the deceased, barring his recovery.

3. What were the rights of the defendant truck company on the street?

The street was kept open for travel, at least for trucks coming in to the factory. True, the streets were obstructed on the surface by piles of brick, sand, and the mixer, etc., as the photograph Exhibit 1 shows, and a trucker driving through there had to carefully pick his way to avoid the surface obstructions. But granting that it was proper to cross the street with the tag line, it must be done in the view of existing circumstances. The tag line should have been so placed across the street that there was practically no possibility of it coming in contact with any of the trucks that had to go through there, unless they were of extraordinary height, at least, and there is no showing as to that here. So the deceased, in the position of foreman, occupied a position as representative of his company, and was held in the exercise of ordinary care to see that every means possible were taken to prevent such an occurrence as is claimed to have taken

place here. And under the rule laid down in this court, in Banning v. C. R. I. & P. Ry. Co., 89 Iowa 74, 81, 56 N. W. 277, 279, the court says: "The rule is that, if the injured party contributed in any way, or in any degree directly to the injury, there can be no recovery."

And this court reversed the lower court in that case for giving an instruction that,

"* * * in order to defeat recovery, [he] must have materially or substantially contributed to produce the injury; that is, the negligence of the deceased must have contributed 'in an important degree' to the injury in order to prevent a recovery. Such is not the law in this state."

So under the rules laid down in these cases, and in many other cases we might cite, because it has become "horn book" rule in this state, we hold there could be no recovery on account of the contributory negligence of the deceased. The truck was rightfully on the street, because it must be presumed that when the construction company took the contract to make the building, knowing all the circumstances and knowing the need and necessity for trucks to go through this street to keep the factory running, by delivering to or taking away freight, it must carry on its affairs so as not to interfere with such operations.

4. By what right was the street obstructed by stretching the guy rope across it?

The Maytag Company made a contract with the construction company to erect the office building. Conceding that this gave to the construction company all the rights that the Maytag Company, the owner of both sides of the street, had, without deciding it, it took no greater rights than the Maytag Company had, and hence it was bound to observe the rights of the truckers driving in and out the street the same as the Maytags would have, and hence the agent of the construction company, the plaintiff's intestate in this case, had no greater rights than the company had, and he was the company, so far as seeing that these operations involved in this action, were carried on with meticulous care, to avoid any such catastrophe as took place here.

So we are of the opinion that the court properly sustained the motion to direct a verdict. And if that motion was good on any one ground, the sustaining of the motion was proper. We see no applicability, whatever, in this case, of the proposition

raised by the appellee under the "assured clear distance ahead" rule, which rule is in reference to speed.

Therefore, the decision below is hereby affirmed.—Affirmed.

DONEGAN, ANDERSON, SAGER, STIGER, and HAMILTON, JJ., concur.

RICHARDS, C. J., and KINTZINGER, J., dissent.